# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
October 13, 2011

Lyle W. Cayce
Clerk

No. 09-40892

OSCAR GABRIEL JIMENEZ; CHANDRA RAE JIMENEZ,

Plaintiffs-Appellees,

v.

WOOD COUNTY, TEXAS; SHERIFF DWAINE DAUGHERTY,

Defendants-Appellants.

Appeal from the United States District Court
for the Eastern District of Texas, Marshall Division

Before JONES, Chief Judge, and KING, JOLLY, DAVIS, SMITH, GARZA, BENAVIDES, STEWART, DENNIS, CLEMENT, PRADO, OWEN, ELROD, SOUTHWICK, and HAYNES, Circuit Judges.[*]

JENNIFER WALKER ELROD, Circuit Judge, joined by KING, E. GRADY JOLLY, W. EUGENE DAVIS, BENAVIDES, CARL E. STEWART, DENNIS, PRADO, LESLIE H. SOUTHWICK, and HAYNES, Circuit Judges:

Wood County, Texas and Sheriff Dwaine Daugherty (collectively "the County") appeal from the judgment against them on Oscar and Chandra Jimenez's action under 42 U.S.C. § 1983. For the reasons set forth below, we AFFIRM.

---

[*] Judge Graves did not participate in this decision.

No. 09-40892

I.

Oscar and Chandra Jimenez operated a bar in Wood County. In 2005, the bar hosted a New Year's Eve party, which was attended by undercover agents of the Texas Alcoholic Beverage Commission (TABC). Later that evening, TABC agents raided the bar, assisted by officers of the Wood County Sheriff's Department. Mr. Jimenez fled, and the agents could not locate him. At some point, they began to suspect that he was hiding in the trunk of his wife's car, which was parked behind the bar. After repeated requests by the agents, Ms. Jimenez opened the trunk and the agents' suspicions were confirmed. Mr. Jimenez was arrested for evading arrest and Ms. Jimenez was arrested for hindering apprehension, a Class A misdemeanor under these circumstances. At the Wood County jail, Ms. Jimenez was strip-searched, in accordance with the policy of the Wood County Sheriff's Department. At the time, department policy required strip searches of all persons entering the jail who were arrested for a felony, Class A misdemeanor, or Class B misdemeanor.

Mr. and Ms. Jimenez sued the TABC, Wood County, and Sheriff Daugherty under 42 U.S.C. § 1983, alleging constitutional violations stemming from their arrests. Relevant to this appeal, Ms. Jimenez claimed that, because she was arrested for a minor offense, she could be strip-searched only upon reasonable suspicion that she was concealing weapons or contraband. This claim proceeded to trial. The final jury charge instructed the jury that reasonable suspicion was required for a strip search of a person arrested for a minor offense. Because the court concluded that Ms. Jimenez's offense was a minor offense as a matter of law, the charge directed that if the jury found reasonable suspicion lacking, it must find that the County violated her Fourth Amendment rights. At the charge conference, the County presented only one formal objection to the jury instructions: "Just one objection, Your Honor, the —

No. 09-40892

the Court finding that this was a minor offense as a matter of law. For record purposes, we would object." The County did not object to the "reasonable suspicion" requirement.

The jury ultimately returned a verdict for Ms. Jimenez. In accordance with the jury's verdict, the court entered a final judgment against the County, awarding Ms. Jimenez $55,000 for past and future mental anguish, and $5,000 in punitive damages. In addition, the court awarded $157,394.60 in attorneys' fees, and $37,153.95 in costs. The County appealed, and a panel of this court affirmed. *Jimenez v. Wood Cnty., Tex.*, 621 F.3d 372 (5th Cir. 2010). We granted rehearing en banc and vacated the panel opinion. *Jimenez v. Wood Cnty., Tex.*, 626 F.3d 870 (5th Cir. 2010).

## II.

The County raises two challenges to the jury instructions given at trial.[1] First, the County argues that the jury should not have been instructed that reasonable suspicion was required for the strip search of Ms. Jimenez. According to the County, the decades-old, well-settled precedent of this court requiring reasonable suspicion for strip searches of minor-offense arrestees misinterpreted the Supreme Court's earlier decision in *Bell v. Wolfish*, 441 U.S. 520 (1979). *See, e.g.*, *Kelly v. Foti*, 77 F.3d 819, 821 (5th Cir. 1996) ("Jail officials may strip search a person arrested for a minor offense and detained pending the posting of bond only if they possess a reasonable suspicion that he is hiding weapons or contraband."); *Stewart v. Lubbock Cnty., Tex.*, 767 F.2d 153, 156-57 (5th Cir. 1985) ("Because Lubbock County's strip search policy was applied to

---

[1] Before the panel, the County raised several additional arguments. The County argued that Sheriff Daugherty was entitled to qualified immunity because the law was not clearly established, that the officers had reasonable suspicion that Ms. Jimenez was concealing weapons or contraband, and that the district court erred in determining an appropriate award of attorneys' fees. The panel rejected these arguments, and the County has not raised these issues on rehearing. Accordingly, we reinstate those portions of the panel opinion that decide these issues—namely, Parts III, IV, and V. *See Jimenez*, 621 F.3d at 378-80.

No. 09-40892

minor offenders awaiting bond when no reasonable suspicion existed that they as a category of offenders or individually might possess weapons or contraband, under the balancing test of *Wolfish* we find such searches unreasonable and the policy to be in violation of the Fourth Amendment."). In the wake of *Wolfish*, every other circuit to consider the issue came to the same conclusion as this court.[2] Recently, however, two circuits have overruled their prior precedent,[3] and two others have weighed in for the first time,[4] holding that such strip searches do not require reasonable suspicion. The County urges us to follow the lead of these courts and overrule our precedent requiring reasonable suspicion for the strip search of a person arrested for a minor offense. In the alternative, the County argues that the jury should not have been instructed that Ms. Jimenez's offense was a minor offense as a matter of law. We consider each argument in turn.

## A.

Our standard of review for challenges to jury instructions is governed by Rule 51 of the Rules of Civil Procedure. Rule 51 requires a party to object to jury instructions in order to preserve a claim of error for appeal. An objection

---

[2] *See Swain v. Spinney*, 117 F.3d 1, 7 (1st Cir. 1997); *Weber v. Dell*, 804 F.2d 796, 804 (2d Cir. 1986); *Logan v. Shealy*, 660 F.2d 1007, 1013 (4th Cir. 1981); *Masters v. Crouch*, 872 F.2d 1248, 1255 (6th Cir. 1989); *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1273 (7th Cir. 1983); *Jones v. Edwards*, 770 F.2d 739, 741-42 (8th Cir. 1985); *Giles v. Ackerman*, 746 F.2d 614, 617 (9th Cir. 1984) (per curiam); *Hill v. Bogans*, 735 F.2d 391, 394-95 (10th Cir. 1984); *Wilson v. Jones*, 251 F.3d 1340, 1343 (11th Cir. 2001).

[3] *See Bull v. City & Cnty. of San Francisco*, 595 F.3d 964, 977 (9th Cir. 2010) (en banc) (overruling *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1446-47 (9th Cir. 1989); *Giles*, 746 F.2d at 617); *Powell v. Barrett*, 541 F.3d 1298, 1314 (11th Cir. 2008) (en banc) (overruling *Wilson*, 251 F.3d at 1343).

[4] *See Florence v. Bd. of Chosen Freeholders of the Cnty. of Burlington*, 621 F.3d 296, 308 (3d. Cir 2010); *Bame v. Dillard*, 637 F.3d 380, 386 (D.C. Cir. 2011). The Supreme Court has granted certiorari in *Florence* on the following question: "Whether the Fourth Amendment permits a jail to conduct a suspicionless strip search of every individual arrested for any minor offense no matter what the circumstances." *Florence*, No. 10-945, 131 S. Ct. 1816 (2011).

4

must be made "on the record" and must state "distinctly the matter objected to and the grounds for the objection." Fed. R. Civ. P. 51(c)(1). The objection must have been made on the specific "ground raised on appeal, rather than a general objection to the instructions as a whole or an objection on a different ground." *Fiber Sys. Int'l, Inc. v. Roehrs*, 470 F.3d 1150, 1158 (5th Cir. 2006). Thus, a specific, formal, on-the-record objection is required. *See United States v. Redd*, 355 F.3d 866, 874-75 (5th Cir. 2003).

Rule 51 also dictates the timing of such an objection. After informing the parties of its intended instructions, the court "must give the parties an opportunity to object on the record and out of the jury's hearing before the instructions and arguments are delivered." Fed. R. Civ. P. 51(b)(2). All objections must be made at that time. Fed. R. Civ. P. 51(c)(2)(A).

Where a specific and timely objection is made, we review that objection "under an abuse of discretion standard, affording the trial court substantial latitude in describing the law to the jurors." *United States v. Santos*, 589 F.3d 759, 764 (5th Cir. 2009) (internal quotation marks omitted). Where a proper objection is not made, however, our review of a jury instruction challenge is limited to review for plain error. *See* Fed. R. Civ. P. 51(d)(2) ("A court may consider a plain error in the instructions that has not been preserved as required by Rule 51(d)(1) if the error affects substantial rights."). We have discretion to correct such an unpreserved error only if it is plain, affects substantial rights, and "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Mondragon-Santiago*, 564 F.3d 357, 361 (5th Cir. 2009) (internal quotation marks omitted); *see also* Fed. R. Civ. P. 51(d)(2). If the unpreserved error does not meet this demanding standard, we have no authority to correct it. *United States v. Olano*, 507 U.S. 725, 740 (1993); *see also Puckett v. United States*, 129 S. Ct. 1423, 1429 (2009).

No. 09-40892

## B.

The County argues that the district court erred in instructing the jury that reasonable suspicion was required for the strip search of Ms. Jimenez. Yet the County did not lodge an objection on this ground in the district court. When the court provided an opportunity for the parties to object to the jury instructions, the County objected only to the court's "finding that [hindering apprehension] was a minor offense as a matter of law." Hence, the error has been forfeited.

The County offers two arguments as to why its failure to comply with Rule 51 should be excused. Both are unavailing. First, the County asserts that it sufficiently alerted the district court to its objection by mentioning the Eleventh Circuit's decision in *Powell v. Barrett*[5] during a pre-trial conference before the magistrate judge. This discussion, even if it had amounted to a formal objection to the jury instruction, could not preserve an error for our review because it does not satisfy the timing requirement set forth in Rule 51.[6] Objections to the jury instructions must be made "at the opportunity provided [by the court] under

---

[5] 541 F.3d 1298 (11th Cir. 2008) (en banc). At that time, *Powell* was the only appellate decision supporting the County's position in this appeal.

[6] Furthermore, even if the discussion had taken place at the appropriate time, it would not amount to a specific, formal objection sufficient to preserve the error. *See, e.g.*, *Redd*, 355 F.3d at 874 ("We have repeatedly held that a general objection to the district court's jury instructions is insufficient to satisfy Rule 51." (internal quotation marks omitted)). Indeed, the context in which the County mentioned *Powell* belies the notion that it was attempting to object to the court's "reasonable suspicion" charge. The pre-trial hearing at which these remarks were made dealt entirely with evidentiary issues, such as pre-admitting exhibits for trial. The County's brief reference to *Powell* occurred in the midst of one of these evidentiary objections. Specifically, the County objected to evidence that it had changed its policy to require "reasonable suspicion" for a strip search following the incident in this case, arguing that the evidence was inadmissible as a "subsequent remedial measure." The magistrate judge overruled this objection. The sole effect of this ruling was to admit evidence of the policy change. Neither the ruling nor the objection had anything to do with the jury instructions. In fact, the County did not even mention the jury instructions at this pre-trial conference before the magistrate judge, who did not try the case.

Rule 51(b)(2)"—after the court announces its proposed instructions, and before the instructions and arguments are delivered.[7]  Fed. R. Civ. P. 51(c)(2)(A).

Second, the County argues that it should not have been required to object to preserve error because any objection would have been futile given our controlling precedent requiring reasonable suspicion.  In a similar situation, the Supreme Court refused to create a futility exception to plain error review.  *See Johnson v. United States*, 520 U.S. 461, 465-66 (1997).  In *Johnson*, at the time of trial, "near-uniform precedent both from [the Supreme Court] and from the Courts of Appeals held" that, in a perjury prosecution, the materiality of the alleged false statements could be decided by the judge, rather than the jury.  *Id.* at 467-68.  Unsurprisingly, Johnson did not object at trial to the omission of the materiality element from the jury charge.  *Id.* at 464.  By the time of Johnson's appeal, however, the Supreme Court had overruled its prior precedent.  *Id.*  Even so, the Supreme Court allowed no exception to the rule allowing unpreserved error to be reviewed only for plain error.  *See id.* at 465-66.  The language of Rule 51 clearly sets forth the requirements for preserving error and makes no exception for situations where objection would be futile because of controlling precedent.  "Even less appropriate than an unwarranted expansion of the Rule would be the creation out of whole cloth of an exception to it, an exception which we have no authority to make."  *Id.* at 466.  Futile or not, compliance with Rule

---

[7] Although we have previously held that a party need not make a formal objection where it has already made its position clear to the district court, *see, e.g., Hartsell v. Dr. Pepper Bottling Co. of Texas*, 207 F.3d 269, 273 (5th Cir. 2000); *Russell v. Plano Bank & Trust*, 130 F.3d 715, 720 (5th Cir. 1997), this exception is no longer viable in light of the 2003 amendments to Rule 51.  Rule 51 now expressly dictates the proper timing of objections.  *See* Fed. R. Civ. P. 51(c)(2); 9 James Wm. Moore et al., Moore's Federal Practice § 51.33[1] (3d ed. 2008) (noting that "the amended Rule prevents a party from using the fact that the court is already aware of its position as an excuse for a failure to make a specific, formal objection at the charge conference").  As the Supreme Court has explained, "it is that Rule which by its terms governs" the appeal in this case, and we have no authority to create exceptions to its requirements.  *Johnson v. United States*, 520 U.S. 461, 466 (1997).

No. 09-40892

51 is required to preserve full appellate review of challenges to jury instructions.[8]

Because the County did not make a proper, timely objection regarding the reasonable suspicion requirement, we may review this unpreserved claim only for plain error. *See* Fed. R. Civ. P. 51(d)(2); *Fiber Sys. Int'l*, 470 F.3d at 1158. In this case, we need not decide whether the reasonable suspicion instruction was erroneous, because any error in this regard was not plain.[9] *See United States v. Jackson*, 549 F.3d 963, 977-78 (5th Cir. 2008) (declining to decide the question of error because "[a]ny error here is not plain"). To be plain, "'the legal error must be clear or obvious, rather than subject to reasonable debate.'" *United States v. Ellis*, 564 F.3d 370, 377-78 (5th Cir. 2009) (quoting *Puckett*, 129 S. Ct. at 1429). We have little difficulty concluding that any error in following decades of well-settled circuit precedent does not rise to the level of obviousness.[10] *See*

---

[8] Rather than even suggest an alternative interpretation of Rule 51's plain text, our dissenting colleagues attempt to avoid its effect by citing cases discussing appellate waiver generally. *See, e.g.*, *Citizens United v. Fed. Election Comm'n*, 130 S. Ct. 876, 893 (2010); *Bradley v. Allstate Ins. Co.*, 620 F.3d 509, 519 (5th Cir. 2010); *Belt v. EmCare, Inc.*, 444 F.3d 403, 408-09 (5th Cir. 2006); *Lifemark Hosps., Inc. v. Liljeberg Enters.*, 304 F.3d 410, 428 n.29 (5th Cir. 2002). These cases have no bearing on charge waiver, which is a unique area of the law and the only area governed by Rule 51. Whereas courts are free to carve out exceptions to their own rules of appellate waiver, federal rules of procedure are "as binding as any statute duly enacted by Congress, and federal courts have no more discretion to disregard [a] Rule's mandate than they do to disregard constitutional or statutory provisions." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 255 (1988). Accordingly, the dissenters' criticism that we are "hid[ing] behind waiver" to avoid hard questions is misplaced. This criticism assumes that we have the luxury of resolving legal questions in the abstract. Rigorously following binding procedural rules, however, is not to shirk our duty, but to fulfill it.

[9] Our dissenting colleagues argue that an en banc court should not assume error without deciding the question. The Supreme Court, however, has likewise declined to decide the question when reviewing a jury instruction for plain error, limiting itself to review of the questions significant to the case presented. *Lopez v. United States*, 373 U.S. 427, 436-37 (1963). Here, as was true in *Lopez*, "[i]t is enough to say that in the circumstances of this case, there was in any event no reversible error." *Id.*

[10] The Supreme Court has articulated one exception to this rule: "[W]here the law at the time of trial was settled and clearly contrary to the law at the time of appeal[,] it is enough

No. 09-40892

*United States v. Evans*, 587 F.3d 667, 671 (5th Cir. 2009) (concluding that any error was not plain where argument was novel and not supported by circuit precedent). Indeed, we have previously held that even where an argument merely requires extending existing precedent, the district court's failure to do so cannot be plain error. *United States v. Hull*, 160 F.3d 265, 272 (5th Cir. 1998). Therefore, the County cannot demonstrate that the inclusion of the reasonable suspicion requirement in the jury instructions—a requirement consistent with our longstanding precedent—was plain error.

## C.

The County properly objected to the jury instruction that Ms. Jimenez's offense was minor as a matter of law during the opportunity for objections provided by the court. Accordingly, we review this challenge under the abuse of discretion standard. *Santos*, 589 F.3d at 764.

Ms. Jimenez was arrested for hindering apprehension. The relevant statute provides that a person commits this offense "if, with intent to hinder the arrest, prosecution, conviction, or punishment of another for an offense . . ., he: (1) harbors or conceals the other; (2) provides or aids in providing the other with any means of avoiding arrest of effecting escape; or (3) warns the other of impending discovery or apprehension." Tex. Penal Code Ann. § 38.05(a). Except under circumstances not relevant here, this offense is a Class A Misdemeanor. *Id.* § 38.05(c). The maximum punishment for a Class A Misdemeanor is a fine of $4,000 or less, imprisonment of one year or less, or both. *Id.* § 12.21.

As the panel opinion properly concluded, this offense constitutes a minor offense for purposes of our Fourth Amendment analysis:

---

that an error be 'plain' at the time of appellate consideration." *Johnson*, 520 U.S. at 468. In this case, however, there has been no change in controlling law since the time of trial. Thus, we have no need to apply the exception to the facts here on plain error review and we decline to do so.

[T]he classification of a crime as a misdemeanor has been treated by other circuits as a relevant or even determinative factor in ascertaining whether there is a reasonable suspicion requirement. *See Roberts v. Rhode Island*, 239 F.3d 107, 112 (1st Cir. 2001) ("[W]hen the inmate has been charged with only a misdemeanor involving minor offenses or traffic violations, crimes not generally associated with weapons or contraband, courts have required that officers have a reasonable suspicion that the individual inmate is concealing contraband."); *Weber v. Dell*, 804 F.2d 796, 804 (2d Cir. 1986) ("We conclude that a reasonable suspicion that an accused misdemeanant or other minor offender is concealing weapons or other contraband—suspicion based on the particular traits of the offender, the arrest and/or the crime charged—is necessary before subjecting the arrestee to the indignities of a strip/body cavity search."). In other settings, as well, misdemeanors have historically been considered minor offenses.[11]   In *Stewart*, we cited the applicability of the challenged policy to individuals arrested for misdemeanors in support of our conclusion that the challenged policy was unconstitutional because it applied to minor offenders when no reasonable suspicion existed that they might possess weapons or contraband. *See Stewart v. Lubbock Cnty., Tex.*, 767 F.2d 153, 156 (5th Cir. 1985) (noting that "the detainees were arrestees awaiting bond on misdemeanor or traffic violation charges"). In *Stewart*, however, the detainees had been arrested pursuant to Class C misdemeanors, which, unlike the Class A misdemeanor in this case, were punishable only by fine. Nevertheless, in light of the persuasive authority, we hold that [the misdemeanor variant of] hindering apprehension . . . is, given its misdemeanor status, a minor offense for these purposes . . . .

*Jimenez*, 621 F.3d at 377-78. Therefore, the district court did not err in instructing the jury that Ms. Jimenez's offense was a minor offense as a matter of law.

---

[11] In now-repealed statutes governing the authority of United States Commissioners, for example, "minor offenses" were defined as "misdemeanors punishable under the laws of the United States, the penalty for which does not exceed imprisonment for a period of one year, or a fine of not more than $1,000, or both." *Taberer v. Armstrong World Indus., Inc.*, 954 F.2d 888, 901 n.18 (3d Cir. 1992) (quoting 82 Stat. 1116, formerly codified at 18 U.S.C. § 3401(f) (1964 Supp IV)).

No. 09-40892

## III.

Because the County has not demonstrated reversible error in the jury instructions in this case, we affirm the judgment of the district court. We reinstate Parts III, IV, and V of the panel opinion, which rejected other arguments that the County has not urged on rehearing.

AFFIRMED.

No. 09-40892

JERRY E. SMITH, Circuit Judge, joined by JONES, Chief Judge, and CLEMENT, Circuit Judge,[1] dissenting:

A majority of this court chooses to ignore the Supreme Court and, in the process, nimbly avoids an issue that needs deciding. I respectfully dissent.

First, the majority incorrectly concludes that Wood County did not preserve its error. The county raised, in the district court, the argument that our precedent is at odds with Supreme Court caselaw, only to have the argument properly rejected. Given that a district court does not have the authority to overrule our precedents, any further objections would have been futile. More egregious, however, is the majority's failure to address an important constitutional issue: whether the precedent of this circuit, requiring individualized reasonable suspicion before conducting a strip-search of individuals arrested for minor offenses, is incorrect in light of governing Supreme Court caselaw.

Even if the county did not properly preserve its argument—and our review is thus for plain error—the first step of the plain-error analysis requires us to decide whether there was error at all. The majority, however, declares that the error was not plain before it decides whether error itself was present. By failing to follow the plain-error analysis properly, the majority chooses to avoid the issue of whether our precedent is at odds with Supreme Court caselaw. And because our precedent is, in fact, directly contrary to a Supreme Court decision, that failure—and the corresponding failure to correct the law of this circuit—is inexcusable.

I.

Chandra Jimenez was arrested for hindering prosecution, a Class A misdemeanor. She was taken to Wood County Jail, where an employee of the Sheriff's

---

[1] Chief Judge Jones and Judge Clement fully join parts II and III, concerning error preservation, but do not completely agree with parts IV and V regarding the interpretation of Supreme Court precedent.

No. 09-40892

Department conducted a strip search. At the time, it was the policy of the department to perform a strip search on all detainees entering the jail who were arrested for a felony, a Class A misdemeanor, or a Class B misdemeanor.

Jimenez sued, alleging that the search violated her rights under the Fourth Amendment. On appeal of a judgment for Jimenez, the county argued, among other things, that, under *Bell v. Wolfish*, 441 U.S. 520 (1979), individualized reasonable suspicion is not required to conduct automatic strip searches of all newly arrested detainees, regardless of the charged offense. The panel, however, bound by the precedent of this circuit, concluded that "a strip search of an individual arrested for a minor offense must be premised on reasonable suspicion that the detainee is carrying weapons or contraband." We took the case en banc to determine whether our precedent is correct.

II.

The majority focuses solely on whether Wood County properly objected to the jury instruction. And yet, by the time the instructions were considered, the district court had already determined that the case would be governed by established Fifth Circuit precedent—a rather obvious conclusion, given that a district court does not have the authority to overrule our precedents. Any objection to the contrary would have been futile.[2] Accordingly, a narrow-minded focus on the whether a jury instruction was properly assigned a Federal Rule of Criminal Procedure 51 objection is inappropriate; rather, our inquiry should be whether the county essentially preserved the argument that our caselaw should be overruled as contrary to the decisions of the Supreme Court. "The general rule of

---

[2] The reason for requiring an objection is "to alert the trial court to instruction errors." 9 JAMES W. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 51.33[2] (3d ed. 2008). There were no errors in this instruction, because the court properly applied Fifth Circuit precedent. Thus, there was no legitimate basis for Wood County to raise an objection, nor would any purpose be served by objecting. Any objection might even have been considered frivolous and annoying.

this court is that arguments not raised before the district court are waived and will not be considered on appeal," *Celanese Corp. v. Martin K. Eby Const. Co.*, 620 F.3d 529, 531 (5th Cir. 2010), but "[a]lthough issues not raised before the district court are generally waived, 'an argument is not waived on appeal if the argument on the issue before the district court was sufficient to permit the district court to rule on it.'"[3]

The attorneys and magistrate judge addressed the issue of the minor-offense rule at a pretrial conference, at which they were discussing the admissibility of various exhibits. They turned their attention to a proposed exhibit consisting of the written search policy that superseded the Wood County policy under which Jimenez was searched. The attorney for the county, Mr. Davis, began explaining the existing caselaw, and the court responded in a manner that suggested its familiarity with the Fifth Circuit minor-offense rule. After pressing the issue of what qualified as a minor offense, Davis turned to the uncertainty of the underlying caselaw:

> MR. DAVIS: . . . Now, there's—there's still people who believe that everything above a Class C misdemeanor is fair game. But out of an abundance of caution—obviously, people who counsel counties would prefer that they take, you know, a more stringent approach.
>
> THE COURT: There's a lot—in other words, because there's a lot of offenses above Class C that aren't closely aligned with the possession of weapons or contraband and—
> MR. DAVIS: You know—
>
> THE COURT: —there's a really good argument that even some felonies wouldn't fall into that category.

---

[3] *Bradley v. Allstate Ins. Co.*, 620 F.3d 509, 519 (5th Cir. 2010) (internal quotations and citation omitted); *see also Belt v. EmCare*, 444 F.3d 403 (5th Cir. 2006); *Lifemark Hosps., Inc. v. Liljeberg Enters.*, 304 F.3d 410, 428 n.29 (5th Cir. 2002). *Cf. Hartsell v. Dr. Pepper Bottling Co. of Tex.*, 207 F.3d 269, 273 (5th Cir. 2000) ("The failure to [object to a specific jury instruction] so may be excused when a party's position equating to an objection has previously been made clear to the trial judge, and further objection would be unavailing.").

No. 09-40892

> MR. DAVIS: You know, that's—that's true, Your Honor. There's—there are arguments both ways. And frankly speaking, the Fifth [he means the Eleventh] Circuit [*sic*] now has come out with a completely different standard and they've held that everything above a Class C misdemeanor is subject to the person coming into the jail being strip searched [*sic*], so—

After some confusion arising from the fact that Davis had misspoken with regard to which circuit had issued the ruling, Davis explained it was an Eleventh Circuit decision that had repudiated the minor-offense rule:

> MR. DAVIS: And that was a fairly recent case. I believe it was September or something like that. But it—it re-examined and changed the policy and basically held to a Wolfish standard which is if you can show a legitimate penological interest in having people strip searched, then it's the penological interest that should dominate, and that's why the Eleventh Circuit—that's what it based its holding on.
>
> THE COURT: That's an Eleventh Circuit case, though, right?
>
> MR. DAVIS: It's Eleventh Circuit.
>
> THE COURT: Right, I understand that. It cited a Fifth Circuit case though and said that it believed those cases were wrong, right?
>
> MR. DAVIS: The previous cases. The Fifth Circuit cases that I know haven't addressed this recent Eleventh Circuit case.
>
> THE COURT: Well, that's—the Eleventh Circuit case you're referring to, I read it, and it distinguished what it believed the controlling law was in the Fifth Circuit which it was not a strict Bell versus Wolfish standard as I—as I read the Eleventh Circuit case. Okay. I was—I thought that you told me there was a recent Fifth Circuit case that—
> MR. DAVIS: Oh, no—
>
> THE COURT: —abandoned its prior precedent, so—

No. 09-40892

That exchange confirms that (1) the county informed the court that the Eleventh Circuit had held that Fifth Circuit precedent was in error; (2) the magistrate judge acknowledged and seemed to understand the Eleventh Circuit's holding; and (3) the magistrate judge understood that the Eleventh Circuit had not raised any reason to think that the relevant Fifth Circuit caselaw had been abrogated. Following the discussion, all the attorneys knew that existing Fifth Circuit law would control.

The colloquy was "sufficient to permit the district court to rule on," *see Bradley*, 620 F.3d at 519, the question whether our precedent remained good law. The exchange was sufficient, despite its relative paucity, because the question was not particularly difficult—the court obviously could not rely on Eleventh Circuit caselaw to overrule Fifth Circuit precedent. An extended objection and argument on that issue were unnecessary.[4]

Furthermore, it is sometimes appropriate, where a party has preserved an issue that is itself premised on a false assumption, to reconsider the assumption rather than allow the rules of waiver to force the court to "assum[e] a premise . . . that is itself in doubt." *Citizens United v. Fed. Election Comm'n*, 130 S. Ct. 876, 893 (2010). Even the majority does not doubt that the county preserved the issue of whether hindering apprehension constitutes a minor offense. That

---

[4] The county's only misstep was not formally objecting to argue that the court should overrule Fifth Circuit precedent. Under the rule referenced in *Bradley*, however, the lack of such a formal objection is not necessarily fatal. A court "should not require a party to object when it would not have produced any results in the trial court because a solid wall of Circuit authority then foreclosed the point." *Murray v. Anthony J. Bertucci Constr. Co.*, 958 F.2d 127, 129 n.1 (5th Cir. 1992) (citation and internal quotation marks omitted). Though the majority is correct that we must reconsider our statement in *Murray* in light of intervening cases, including *Johnson v. United States*, 520 U.S. 461 (1997), the fact that our circuit precedent was settled is still relevant to the question whether "the argument on the issue before the district court was sufficient to permit the district court to rule on" whether our precedents should be overruled. Here, there was a solid wall, so additional argument was unnecessary —merely pointing out the countervailing precedent, and agreeing that it was from outside the Fifth Circuit, were sufficient to allow the district court to rule that Fifth Circuit law would govern.

No. 09-40892

issue, however, is premised on a false assumption—that it matters, under the Fourth Amendment, whether the offense was minor. Accordingly, as in *Citizens United*, it would be prudent for this en banc court to reconsider the minor-offense rule itself rather than expend our efforts on considering the application of a rule that is in doubt.

### III.

If, assuming *arguendo*, the county did not properly preserve the error, the majority is correct to conclude that our review is for plain error,[5] but the majority errs, because it does not actually conduct a plain-error analysis. In a typical case, that analysis proceeds as follows: First, the panel determines that an issue was not properly preserved and that it must now review for plain error (there is no *discretion* here; the panel *must* review for plain error.). Next, the panel addresses the first prong of the plain-error test: was there error? If there was, the panel examines whether the error was plain. If so, the panel decides whether that plain error affected substantial rights. If it did, the panel decides whether to exercise its discretion to correct the error on the ground that it affects the integrity and fairness of the judicial proceedings.[6]

Accordingly, the next step, after the majority concluded that the county did not properly preserve its argument, would be to determine whether there was error. Specifically, we would have to decide whether our precedent, which states that individualized reasonable suspicion is needed to conduct a strip search of

---

[5] To prove plain error, a party must "show (1) there was error, (2) the error was plain, (3) the error affected his substantial rights, and (4) the error seriously affected the fairness, integrity or public reputation of judicial proceedings." *United States v. Jackson*, 549 F.3d 963, 975 (5th Cir. 2008).

[6] Notice that this is the only discretionary step in the plain-error analysis. Where error is not preserved, we must engage in plain-error review, applying the four prongs *seriatim*. It is only if we reach the fourth prong that we have the discretion to grant relief to the non-preserving appellant.

someone arrested for a minor offense, is correct in light of governing Supreme Court caselaw. But this is not what the majority does. It instead chooses to pretermit step one of the plain-error test and jump directly to step two, at which the majority concludes that any possible error was not plain and that the county is accordingly not entitled to relief.

There is no credible rationale for the majority's decision to avoid step one of the plain-error test. The issue has been thoroughly briefed and extensively discussed, and neither party would be prejudiced by our consideration of it. Moreover, the question whether reasonable suspicion is necessary before conducting a strip search of those arrested for minor offenses is plainly an important question of law, evidenced by the existence of a recent circuit split—a split that has drawn the attention of the Supreme Court, no less.[7]

If there was error, but it was not plain, we should at least announce a rule that—even if the county cannot benefit from it because it was not preserved —will affect future circumstances involving the common situation of searches in detention facilities. The county would lose this appeal, yes, but the en banc role would have been fulfilled: We would be correcting our circuit's erroneous precedent and announcing a rule so that the law would be "plain" the next time there is a strip search of a detainee. After all, we take cases en banc to "secure or maintain uniformity of the court's decisions" or decide a "question of exceptional importance"[8]—not merely to ensure that a dispute between two parties is correctly resolved.

I do not deny that the majority's approach—assuming-without-deciding that an error is present in order to decide the case on the ground that the error

---

[7] The Supreme Court is reviewing a case addressing this issue. *See Florence v. Bd. of Chosen Freeholders of Burlington*, 621 F.3d 296 (3d Cir. 2010), *cert. granted*, 131 S. Ct. 1816 (2011).

[8] FED. R. APP. P. 35(a).

No. 09-40892

would nonetheless not be plain—is common in panel decisions of this court. It is one thing, however, for a panel to "assume-without-deciding" when confronted with an open question of law. It is another thing entirely when the en banc court chooses to avoid addressing a possible conflict with controlling Supreme Court precedent by using that same approach. The former is understandable, and perhaps even admirably pragmatic; the latter is an indefensible abdication of our duty as a lower court to enforce the decisions of the Supreme Court.

## IV.

The next step should be determining whether there was error—namely, whether our precedent requiring individualized reasonable suspicion before conducting a strip search of those arrested for a minor offense is in accord with *Wolfish*. Obviously, it is not, as a brief overview of *Wolfish*, our precedent, and the countervailing caselaw will show.

## A.

In *Wolfish*, the Court rejected a Fourth Amendment challenge to a detention center's policy of conducting strip and visual body cavity searches on all detainees after a contact visit with outsiders, regardless of the reason for their incarceration and without any reasonable suspicion that a detainee possessed contraband ("the strip-search policy"). *Wolfish* was a class action brought by pretrial detainees and convicted prisoners who were being housed in the New York City Metropolitan Correctional Center ("MCC"). *Wolfish*, 441 U.S. at 523. The challenged strip search policy, however, applied to all individuals housed in the MCC, not just pretrial detainees and convicted prisoners. *Id*. at 558. In addition to those persons, the MCC also housed witnesses in protective custody and those incarcerated for contempt of court, all of whom were also subject to the strip-search policy. *Id*. at 524.

No. 09-40892

Under that policy, all detainees were required to "expose their body cavities for visual inspection as part of a strip search conducted after every contact visit with a person from outside the institution." Specifically, a male inmate was required to "lift his genitals and bend over to spread his buttocks for visual inspection," and a female inmate was required to allow visual inspection of her "vaginal and anal cavities." *Id.* at 558 n.39.

The Supreme Court upheld the MCC's strip search policy in its entirety, holding that searches conducted under the policy were reasonable under the Fourth Amendment. Assuming without deciding that individuals retain some Fourth Amendment rights following commitment to a correctional facility, the Court explained that the reasonableness test requires "a balancing of the need for the particular search against the invasion of personal rights that the search entails." *Id.* at 559. The Court specified four factors a court should consider to assess the reasonableness of a search: (1) the scope of the intrusion; (2) the manner in which the search is conducted; (3) the justification for initiating the search; and (4) the place in which the search is conducted. *Id.*

In applying its balancing test to the facts of *Wolfish*, the Court acknowledged the degree to which the strip-search policy invaded the personal privacy of the detainees, but it emphasized the security interests of the MCC, recognizing that "[a] detention facility is a unique place fraught with serious security dangers" and that "[s]muggling of money, drugs, weapons, and contraband is all too common an occurrence." *Id.* The Court concluded that, after "[b]alancing the significant and legitimate security interests of the institution against the privacy interests of the inmates," the Fourth Amendment did not prohibit visual body cavity inspections "conducted on less than probable cause." *Id.* at 560. The Court also specifically rejected the argument that pretrial detainees should receive greater Fourth Amendment protection from searches conducted pursuant to the strip-search policy than do convicted detainees:

No. 09-40892

Neither the Court of Appeals nor the District Court distin-guished between pretrial detainees and convicted inmates in review-ing the challenged security practices, and we see no reason to do so. *There is no basis for concluding that pretrial detainees pose any lesser security risk than convicted inmates.* Indeed, it may be that in certain circumstances they present a greater risk to jail security and order. In the federal system, a detainee is committed to the detention facility only because no other less drastic means can rea-sonably assure his presence at trial. As a result, those who are detained prior to trial may in many cases be individuals who are charged with serious crimes or who have prior records. They also may pose a greater risk of escape than convicted inmates. This may be particularly true at facilities like the MCC, where the resident convicted inmates have been sentenced to only short terms of incar-ceration and many of the detainees face the possibility of lengthy imprisonment if convicted.

*Id.* at 547 n.28 (citations omitted).

In the three decades since *Wolfish*, ten circuits, including this court, applied the balancing test in *Wolfish* and concluded that an arrestee charged with minor offenses may not be strip-searched unless there is reasonable suspi-cion that he is concealing a weapon or other contraband.[9] During those decades,

---

[9] *See, e.g., Roberts v. Rhode Island*, 239 F.3d 107, 113 (1st Cir. 2001) (holding that a blanket policy of strip-searching arrestees was unreasonable as applied to those arrested for minor offenses); *Wilson v. Jones*, 251 F.3d 1340, 1343 (11th Cir. 2001) (holding that strip searches without reasonable suspicion violate the Fourth Amendment); *Kelly v. Foti*, 77 F.3d 819, 821 (5th Cir. 1996) ("Jail officials may strip search a person arrested for a minor offense and detained pending the posting of bond only if they possess a reasonable suspicion that he is hiding weapons or contraband."); *Masters v. Crouch*, 872 F.2d 1248, 1255 (6th Cir. 1989) ("[A]uthorities may not strip search persons arrested for traffic violations and nonviolent minor offenses solely because such persons ultimately will intermingle with the general popu-lation at a jail when there were no circumstances to support a reasonable belief that the detainee will carry weapons or other contraband into the jail."); *Weber v. Dell*, 804 F.2d 796, 802 (2d Cir. 1986) (Jail officials may not strip search persons arrested for "minor offenses unless the officials have a reasonable suspicion that the arrestee is concealing weapons or other contraband."); *Jones v. Edwards*, 770 F.2d 739, 742 (8th Cir. 1985) (holding that a strip search of one arrested for violation of a leash law was unreasonable under *Wolfish* where the police had no reason to suspect he would try to sneak a weapon or contraband into the holding cell); *Giles v. Ackerman* 746 F.2d 614, 615 (9th Cir. 1984) ("[A]rrestees for minor offenses may (continued...)

No. 09-40892

no circuit court held otherwise.

That changed in 2008, when the en banc Eleventh Circuit overruled its precedent to hold that, under *Wolfish*, the Fourth Amendment permits strip searches of all arrestees that are being booked into a detention facility, regardless of whether there was any reasonable suspicion that an arrestee possessed contraband.[10]  The en banc Ninth Circuit followed suit in 2010, overruling its precedent to uphold a blanket policy of strip-searching all arrestees before they enter a general jail population.[11]  Also in 2010, a panel of the Third Circuit, in *Florence*, joined the Ninth and Eleventh, upholding strip-search procedures employed by a county jail and a county correctional facility that did not require reasonable suspicion to search all detainees.  Finally, in 2011, a panel of the District of Columbia Circuit adopted the Eleventh Circuit's approach.[12]

### B.

In this court, the majority rule was embraced for the first time in *Stewart v. Lubbock County*, 767 F.2d 153 (5th Cir. 1985).  We addressed a Fourth Amendment challenge to a jail policy that allowed for a strip search of all arres-

---

[9] (...continued)
be subjected to a strip search only if jail officials have a reasonable suspicion that the particular arrestee is carrying or concealing contraband or suffering from a communicable disease.");
*Hill v. Bogans*, 735 F.2d 391, 394 (10th Cir. 1984) (holding that it was unreasonable to strip-search a person arrested for a traffic violation, because there was no reasonable suspicion that he was concealing contraband); *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1273 (7th Cir. 1983) (holding that a strip search of arrestees charged with minor offenses was unreasonable "without a reasonable suspicion by the authorities that either of the twin dangers of concealing weapons or contraband existed"); *Logan v. Shealy*, 660 F.2d 1007, 1013 (4th Cir. 1981) (holding that a strip-search policy "cannot be constitutionally justified simply on the basis of administrative ease in attending to security considerations.").

[10] *Powell v. Barrett*, 541 F.3d 1298, 1314 (11th Cir. 2008) (en banc).

[11] *Bull v. City & Cnty. of San Francisco*, 595 F.3d 964, 977 (9th Cir. 2010) (en banc).

[12] *Bame v. Dillard*, 637 F.3d 380 (D.C. Cir. 2011).

22

tees, regardless of the severity of the charge or of whether there was reasonable suspicion that an arrestee possessed any weapons or contraband. *Id.* at 154.

Confronted with an issue of first impression for this circuit (notwithstanding *Wolfish*), the court turned to *Mary Beth G. v. City of Chicago,* 723 F.2d 1263 (7th Cir. 1983). There, the court held that a city policy requiring a strip search and visual body cavity search of all women arrested and detained in a city lockup, regardless of the severity of the charge and regardless of whether there was reasonable suspicion that the arrestee possessed any weapons or contraband, was unconstitutional under the Fourth Amendment. The court began its analysis with *Wolfish*:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Mary Beth G.*, 723 F.2d at 1271 (quoting *Wolfish*, 441 U.S. at 559).

The Seventh Circuit went on, however, to distinguish its facts from those in *Wolfish*. The court stated that the detainees in *Wolfish* "were awaiting trial on serious federal charges after having failed to make bond and were being searched after contact visits." *Id.* at 1272. Conversely, the detainees in *Mary Beth G.* were "minor offenders who were not inherently dangerous and who were being detained only briefly while awaiting bond." *Id.*

After distinguishing *Wolfish*, the *Mary Beth G.* court applied the *Wolfish* balancing test and concluded that the need for strip-searching "minor offenders who were not inherently dangerous and who were being detained only briefly while awaiting bond . . . when there was no reason to believe they were hiding weapons or contraband on their persons" did not outweigh the personal privacy interest of the detainees. *Id.* The court ruled that the strip searches were

No. 09-40892

unreasonable unless there was a reasonable suspicion that weapons or contraband might be concealed. *Id.* at 1273.

This court in *Stewart* aped the reasoning of the Seventh Circuit without further analysis and declared the strip-search policy unconstitutional.[13] *Stewart* has since been cited as establishing a precedent in this circuit that reasonable suspicion is necessary to strip-search those arrested for minor offenses.[14] No court in this circuit has since attempted to bolster the reasoning contained *Stewart* for distinguishing *Wolfish*—nor does the majority do so today.

## C.

In *Powell*, the en banc Eleventh Circuit rejected a Fourth Amendment challenge to a policy of strip-searching all arrestees at the time of intake in the jail, regardless of the offense charged or of whether there was reasonable suspicion that an arrestee possessed weapons or contraband:

> The reasoning that leads us to uphold the searches of these five plaintiffs is simple. After balancing the privacy interests of detention facility inmates against the important security interests involved, the Supreme Court upheld the visual body cavity strip searches at issue in the *Bell* case against a Fourth Amendment attack. The security needs that the Court in *Bell* found to justify strip searching an inmate re-entering the jail population after a contact visit are no greater than those that justify searching an arrestee when he is being booked into the general population for the first time. And the searches conducted in the *Bell* case were more intrusive, and thereby impinged more on privacy interests, than those conducted in this case. It follows from the *Bell* decision that the less intrusive searches in this case do not violate the Fourth Amendment.

---

[13] The *Stewart* panel cited *Logan v. Shealy,* 660 F.2d 1007 (4th Cir. 1981), as additional support but did not provide a significant discussion of that case.

[14] *See, e.g., Williams v. Kauffman Cnty.*, 352 F.3d 994, 1004 (5th Cir. 2003); *Watt v. Richardson*, 849 F.2d 195, 197 (5th Cir. 1988).

No. 09-40892

*Powell*, 541 F.3d at 1302.  Essentially, the court held that the facts of *Wolfish* dictate the holding in cases involving those who are strip-searched before entry into a detention facility regardless of the offense for which they are arrested and regardless of whether there was any reasonable suspicion that the person possessed weapons or contraband.  This is for two reasons.

First, *Wolfish* explicitly rejected any distinction in security risk based on whether the detainee was a convicted offender or merely an arrestee.[15]  Furthermore, the strip-search policy upheld in *Wolfish* applied to individuals who were not even under arrest, such as non-offenders held as material witnesses.  Under the *Wolfish* factors, there is no basis by which to afford greater protection to misdemeanor arrestees in county detention facilities compared to the protection afforded to witnesses in protective custody in a federal detention facility.

Second, the basis for the security concerns in *Wolfish*—contact visits with outsiders—is also present at the time of intake.  "[A]n inmate's initial entry into a detention facility" is essentially "coming after one big and prolonged contact visit with the outside world."  *Powell*, 541 F.3d at 1310.

Thus, *Wolfish* cannot be conscientiously distinguished on the basis of the severity of the offense committed by the detainee or the gravity of the risk posed following inmate contact visits versus initial entry into the detention center.  Without those two factors, there is no reasonable basis by which *Wolfish* can be distinguished from the facts of the cases that have led to the majority rule.

D.

Some have argued that, although *Wolfish* eliminated the distinction between convicted offenders and pretrial detainees who do not qualify for release on bail, it did not do away with the distinction between those groups and all

---

[15] *See Wolfish*, 441 U.S. at 546 n.28 ("There is no basis for concluding that pretrial detainees pose any lesser security risk than convicted inmates.").

arrestees generally.  That is, however, a misreading of *Wolfish*.

The *Wolfish* Court was addressing a challenge to the policy as a whole; essentially, it was a facial challenge, not as-applied.  The Court, fully aware that the strip-search policy was applied to those who had not even been arrested for any offense, chose to allow the policy to stand in its entirety.  The Court did not separate the detainees into categories and then conduct a Fourth Amendment test to determine the reasonableness of the searches for each category.  Nor did it say that the policy was fine for pretrial detainees and convicted offenders but not for others.  Instead, the Court flatly declared that the policy did not violate the Fourth Amendment.

Importantly, *Wolfish* was a class action, in which the district court had explicitly identified the class as "all persons detained in the Metropolitan Correctional Facility ['MCC']."  *U.S. ex rel. Wolfish v. Levi*, 439 F. Supp. 114, 119 n.1 (S.D.N.Y. 1977).  The district court had made sure to specify that the class included "the pre-trial detainees for whom the facility was primarily designed, sentenced prisoners either awaiting assignment to a prison facility or assigned here to serve their (usually relatively short) terms, prisoners here on writs to testify or to stand trial, witnesses in protective custody, and persons incarcerated for contempt."  *Id.* (emphasis added).  Even if the Supreme Court chose, rhetorically, to focus on pretrial detainees and convicted detainees, the case it decided concerned more than those categories—it also involved those who were not even suspected of committing an offense, such as witnesses being held in protective custody.

Unless one believes that *Wolfish* is just an advisory opinion in which the Justices mused generally on how we should treat detainees, it must be acknowledged that the opinion was an explanation for a *ruling* that decided a case filed on behalf of all individuals detained in the MCC, including those who had not even been arrested for an offense.  The *Wolfish* Court held that all members of

the plaintiff class—even detainees who were not under arrest—could be given a cavity search without any reasonable suspicion that they possessed contraband, and merely because they were being detained in that facility. That is the holding of *Wolfish* that binds us.[16]

## E.

In sum, though our precedent superficially adheres to the balancing test in *Wolfish*, it fails to give proper weight to the manner in which the Supreme Court actually applied the test. There are no legitimate grounds for distinguishing between the facts of *Wolfish* and the facts here. If the strip-search policy in *Wolfish* did not require reasonable suspicion under the Supreme Court's balancing test, the strip-search policy here must also not require reasonable suspicion under that same test. Thus, any court that performs the balancing test to reach a contrary conclusion is necessarily misapplying the test set forth by the Supreme Court.

Consider the following hypothetical: If Jimenez had been arrested and, for some reason, taken to a detention facility in Wood County that was exactly the same as the one in *Wolfish*, our current, misguided precedent would still require reasonable suspicion before conducting a strip search on her, and merely because she was arrested for a minor offense. That is the categorical rule we have set in place. But such a rule is plainly not a faithful application of *Wolfish*, which analyzed the safety concerns present in the detention facility as a whole without re-

---

[16] It is true that none of the categories of detainees that comprised the class in *Wolfish* is an exact match for an individual arrested for a minor offense. It would be nonsensical, however, to believe that the Supreme Court's test for the reasonableness of a strip search would consider persons detained because they had been arrested for committing an offense to be less of a risk than those who had been detained just because they were witnesses in protective custody. It is not rational to distinguish *Wolfish* on the technical ground that it does not explicitly refer to misdemeanor arrestees, and then apply the *Wolfish* balancing test to hold that those arrestees somehow deserve greater Fourth Amendment protection under the test than do witnesses in protective custody.

gard to the danger posed by a person based on his alleged offense. One may quibble over what the correct approach should be—given other variables—but this example proves that our precedent cannot possibly be correct.

Moreover, the analysis in *Stewart*—the first case to establish the minor-offense rule in the Fifth Circuit—is flawed. The *Stewart* panel relied on *Mary Beth G.*, which, 73 F.2d at 1272, distinguished *Wolfish* on the basis of the severity of the offense for which the detainee was arrested. As the Eleventh Circuit pointed out in *Powell*, that is a blatant misreading of the majority opinion in *Wolfish*, 441 U.S. at 546 n.28, which explicitly states that the Court's ruling applied regardless of the reason why the individual was detained in the correction center. The panel erred in *Stewart*, and the law in this circuit has been contrary to Supreme Court precedent ever since.

## V.

The majority also ignores an important consideration: that corrections officials "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Wolfish*, 441 U.S. at 547. That deference is not on account just of the practical realities of detention facilities but is based on an acknowledgment of the structural limitations of the judicial branch.[17] "[C]ourts should defer to the informed discretion of prison administrators because the realities of running a corrections institution are complex and difficult, courts are ill equipped to deal with these problems, and the management of these facilities is confided to the Executive and Legisla-

---

[17] "[J]udicial deference is accorded not merely because the administrator ordinarily will, as a matter of fact in a particular case, have a better grasp of his domain than the reviewing judge, but also because the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial." *Wolfish*, 441 U.S. at 548 (citing *Procunier v. Martinez*, 416 U.S. 396, 405 (1974)).

No. 09-40892

tive Branches, not to the Judicial Branch."[18]

In *Jimenez*, an arrested individual was placed in a secure area of a detention facility alongside other detainees. When a person is brought to a county jail for holding, the corrections officials know very little about their new resident; they see only the reason for the arrest, which may have no relationship to the security risk he poses. To require those officials to have reasonable suspicion for a search before exposing them to other detainees would be impractical and could cause a significant security risk. The Wood County Sheriff imposed the strip-search policy to ensure that those security risks would be controlled; given *Wolfish*, and in accord with common sense, we should defer to that policy judgment.

## VI.

In sum, the majority incorrectly concludes that the county did not preserve error. But, more importantly, the majority wrongly declares that the error was not plain before deciding whether there even was error. If a majority of this en banc court (incorrectly) believes that our precedent is not at odds with Supreme Court jurisprudence, let those judges say so. If, on the other hand, a majority of our judges realize that we have misapplied a Supreme Court decision, we should use the opportunity of en banc rehearing to correct the error. In either circumstance, there is no need to hide behind waiver or assuming-without-deciding.

I can think of no reason—and the majority surely has not provided one—for electing not to address whether our precedent is at odds with *Wolfish*, beyond a desire to avoid deciding difficult questions. But resolving hard issues is what the en banc process is usually all about. I respectfully dissent.

---

[18] *See id.* at 548 n.29 (citing *Jones v. N.C. Prisoners' Labor Union*, 433 U.S. 119, 126 (1977); *Pell v. Procunier*, 417 U.S. 817, 827 (1974); *Martinez*, 416 U.S. at 404-05).

No. 09-40892

EMILIO M. GARZA, Circuit Judge, with whom EDITH H. JONES, Chief Judge, JERRY E. SMITH, EDITH BROWN CLEMENT, and PRISCILLA R. OWEN, Circuit Judges, join, dissenting:

The majority refuses to acknowledge the most salient issue raised by the County before the panel and this en banc court: whether this court's precedent in *Stewart v. Lubbock County,* 767 F.2d 153 (5th Cir. 1985), and its progeny, requiring reasonable suspicion before individuals arrested for minor offenses can be subjected to visual strip searches, conflicts with the Supreme Court's holding in *Bell v. Wolfish*, 441 U.S. 520 (1979). That is, the County contends not that the district court failed to follow Fifth Circuit precedent but that the Fifth Circuit failed to follow Supreme Court precedent. The County raises this issue separately from the objection to the jury charge under current caselaw. The majority holds, nonetheless, that Wood County failed to preserve this separate issue by not objecting to the district court's jury instructions on this distinct ground as required by Rule 51 of the Federal Rules of Civil Procedure. But the majority conflates the issues: the County has not argued that the *Bell v. Wolfish* error is confined to the jury instructions. That is, the County's challenge to the minor offense rule before this court is not wed to its alternative claim of jury charge error regarding the application of the "minor offense" rule under current caselaw.[1] The *Wolfish* error permeates the entire case. While the County certainly needed to satisfy the requirements in Rule 51 in order to preserve its alternative argument under current caselaw, its general challenge to the minor offense rule presents us with a broader question: whether the County's failure to challenge the "minor offense" rule at the trial level prevents this en banc court from considering the obvious tension between our caselaw and Supreme Court precedent. I believe it does not and respectfully dissent.

---

[1] The panel recognized these were two separate issues, *Jimenez v. Wood Cnty.*, 621 F. 3d 372, 375 (5th Cir. 2010), and so does the majority. *See* majority op. at 3.

All the parties, including the district court, agreed that this case was governed by *Stewart* and its progeny.  Under *Stewart*, authorities can only strip search an individual arrested for a minor offense if the authorities possess reasonable suspicion the arrestee was carrying weapons or contraband.  767 F.2d at 156-57.    Accordingly, any objection couched as a challenge to the "minor offense" rule would have been correctly denied because the trial court had no authority to overrule Fifth Circuit caselaw.  *Jimenez*, 621 F.3d at 376.  The majority holds, however, that such an objection was necessary in order to preserve error before the en banc court.  Namely, it would require an objection to assure the en banc court that the district court knew what the district court and the parties were quite cognizant of—that the "minor offense" rule applied to this case by Circuit caselaw.  Ultimately, the purpose of any objection is to notify the district court that it—the district court—is in error and to give that court an opportunity to correct its error.  *Hartford Lloyd's Ins. Co. v. Teachworth*, 898 F.2d 1058, 1060 (5th Cir. 1990).  Here, an objection to any *Stewart*-based issue could not have served that purpose.  Moreover, the district court had no authority to reconsider *Stewart*.  Nor could the panel have changed the law under these circumstances.  *Martin v. Medtronic, Inc.*, 254 F.3d 573, 577 (5th Cir. 2001).  Instead, the en banc court was the first proper legal venue where Wood County could have successfully brought a point of error challenging the Fifth Circuit's "minor offense" rule.  The purpose of the forfeiture rule is not to prevent an en banc court from correcting its own precedent.

Could this issue have been presented in a Rule 12(b)(6) motion?  Certainly. It could have also been presented in a motion for summary judgment, a motion for judgment as a matter of law, or a motion for relief from judgment under Rule 60(b).  Should this have occurred?  Of course.  However, the question is not whether the County should have challenged *Stewart* and its progeny in the district court, but instead, whether this en banc court should consider the obvious tension between Supreme Court precedent and our caselaw under these

circumstances.  Because (1) any challenge to the minor offense rule would have informed the district court what it already knew and (2) the County has stated a persuasive claim that our precedent conflicts with Supreme Court authority, I would answer yes.[2]  Because the use of a procedural device to avoid addressing an obvious conflict with Supreme Court precedent is objectionable, especially at the en banc level of review, I dissent.

---

[2] Further, I agree with Judge Smith that even if the County did not preserve error and we then review for plain error, under these circumstances we should begin that analysis by addressing whether the district court's instructions contained error, rather than avoiding that question by holding that any error in the instructions was not plain.  *See* Smith's dissent at 6-8.

EDITH BROWN CLEMENT, Circuit Judge, joined by JONES, Chief Judge, and GARZA, Circuit Judge, dissenting:

I join Judge Garza's dissent and parts II and III of Judge Smith's dissent. I write separately to express a narrow disagreement with Judge Smith's application of *Bell v. Wolfish* to Jimenez's claim.

As Judge Smith correctly observes, in upholding a blanket strip-search policy applicable to *all* inmates housed at the MCC, including pretrial detainees and witnesses held in protective custody, *Wolfish* necessarily rejected the need for reasonable suspicion before a person entering the general population of a detention facility may constitutionally be strip searched. *See Bell v. Wolfish*, 441 U.S. 520, 558–60 (1979). I therefore agree with Judge Smith's conclusion that our precedents holding that reasonable suspicion is always required to strip search those arrested for minor offenses are inconsistent with *Wolfish*.

I do not, however, agree with Judge Smith's further conclusion that *Wolfish* necessarily sanctions the strip search of every person even temporarily held at a detention facility. *Wolfish* "requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.* at 559. In *Wolfish*, the justification advanced for the challenged searches was "to discover [and] deter the smuggling of weapons, drugs, and other contraband into the institution." *Id.* at 558. But the threat of this type of contraband smuggling is likely to be significantly lessened when an arrestee is temporarily detained in a holding cell rather than being admitted into the general population of a jail or prison. Indeed, the recent Third, Ninth, and Eleventh Circuit opinions on which Judge Smith relies were all careful to clarify that the strip search policies they respectively upheld were applicable only to arrestees entering the general jail populations. *Florence v. Bd. of Chosen Freeholders of Burlington*, 621 F.3d 296, 311 (3d Cir. 2010) ("[B]alancing the

Jails' security interests at the time of intake *before arrestees enter the general population* against the privacy interests of the inmates, we hold that [these] strip search procedures . . . are reasonable." (emphasis added)); *Bull v. City & Cnty. of San Francisco*, 595 F.3d 964, 980–81 (9th Cir. 2010) (en banc) ("the rights of arrestees *placed in custodial housing with the general jail population* are not violated by a policy or practice of strip searching each one of them as part of the booking process" (emphasis added) (internal quotation marks omitted));[1] *Powell v. Barrett*, 541 F.3d 1298, 1300 (11th Cir. 2008) (en banc) ("We granted rehearing en banc to decide whether a policy . . . of strip searching all arrestees as part of the process of booking them into the *general population* of a detention facility . . . is constitutionally permissible." (emphasis added)).[2]

The record before us indicates that after her arrest, Jimenez was transported to the Wood County jail, strip searched, then placed in a holding cell with three other detainees until she was released the following morning. These facts differ markedly from those considered in *Wolfish*, *Florence*, *Bull*, and *Powell*, all of which dealt with strip searches performed prior to entry (or re-entry) into the general population of a detention facility. Entry into the general population of the MCC facility at issue in *Wolfish* meant access to more than 500 other inmates who, for approximately 16 hours a day, were free to interact with one another in "multipurpose" common rooms. 441 U.S. at 525. Detainees under

---

[1] The Ninth Circuit explicitly left undisturbed its precedents requiring individualized suspicion to strip search "arrestees who were not classified for housing in the general jail or prison population," including intoxicated arrestees detained until sober, arrestees placed in holding cells until posting bond, and arrestees detained prior to a determination of whether they could be released on their own recognizance. *Bull*, 595 F.3d at 981.

[2] The Eleventh Circuit repeatedly emphasized that its analysis was confined to searches performed upon entry or re-entry into the general population. *Powell*, 541 F.3d at 1300, 1301, 1302, 1311. This emphasis is understandable considering the county jail at issue in *Powell* housed over 2,900 inmates—a fact that underscores the difference between detention in a holding cell and entry into a general jail population. *See id.* at 1310 n.4.

such circumstance obviously have far greater opportunities for smuggling (and using) contraband between each other than did Jimenez during her brief stay in a holding cell with three other arrestees. Although *Wolfish* should certainly guide review of Jimenez's claim, I do not agree with Judge Smith that it straightforwardly necessitates a judgment against her. In my view, the balancing test set forth in *Wolfish*, *id.* at 559, requires an evaluation of the "need for the particular search" in light of the specific facts surrounding Jimenez's detention in the Wood County jail—facts which are underdeveloped on this record because they were essentially irrelevant under this court's erroneous minor-offense rule.

Because I would overrule our precedents establishing the minor-offense rule applied by the district court, I would remand for further development of the record and with instructions to decide Jimenez's claim according to the principles articulated in *Wolfish*, particularly that corrections officials "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* at 547.

35